A True Copy
Attest: *Jody A Wagner*
Clerk of Courts

STATE OF MAINE,

CUMBERLAND, ss.

SUPERIOR COURT
CRIMINAL ACTION
Docket Nos. CR-06-2765
and CR-06-3135
WSB-CUM-10/16/2007

STATE OF MAINE,

v.

DECISION

TERREL DUBOIS,

Defendant.

**DONALD** L. GARR---
LAW LIP

FINDINGS

JAN 3 0 2008

1.    On October 11, 2006 Portland police detectives had an outstanding felony arrest warrant (*See* State's Exhibit #1) for Terrel Dubois.

2.    Acting on a tip, and accompanied by South Portland Detective Steven Connors, the police went to an apartment on Elm Street in South Portland.

3.    The police had a good photograph of Mr. Dubois so they knew what he looked like.   They established surveillance outside the South Portland apartment building and observed an African-American man consistent with Mr. Dubois' appearance exit and reenter the building.

4.    The police entered the building and spoke with a tenant.  He said that a man consistent with Mr. Dubois' description had been leaving and entering apartment #1.

5.    Detective Connors and Detective Robert Doherty from the Portland police department knocked on the door to apartment #1.

6.    A young lady named Sarah answered the knock.   Detective Connors showed her his badge and asked for permission to enter.  She said no.

7. Detective Connors asked her for ID. She went to get her ID and Detective Connors saw her talking with an African-American man, some 15 to 20 feet away. Detective Connors established eye contact with the man and recognized him as Terrel Dubois.

8. When Sarah returned to the front door, Detective Connors and Detective Doherty encouraged her to persuade Mr. Dubois to come out and talk things over so there would be no trouble.

9. Detectives Doherty and Connors and Sarah walked to the center of the living room. Mr. Dubois remained in the bedroom, out of sight. Detective Connors was uncomfortable and uncovered his firearm. The detectives did not announce to Mr. Dubois that they were police offers.

10. Mr. Dubois remained in the bedroom as the two officers and Sarah approached him.

11. As Detective Connors reached the door to the bedroom, Mr. Dubois started shooting. Detective Connors and Mr. Dubois were seriously wounded.

12. On October 13, 2006 at the Maine Medical Center, Sergeant Steven Webster and another officer first interviewed Mr. Dubois, who was in custody. Mr. Dubois was in bad shape physically. Most of his attempts to speak were inaudible.

13. On October 24, 2006 at the Maine Medical Center, Sergeant Webster interviewed Mr. Dubois again. Mr. Dubois still had bullets in his body and he was heavily sedated. He did not remember talking to Sergeant Webster on October 13. He had a tube down his throat and he had a problem with phlegm coagulating in the tube. Much of what he did get out was still inaudible.

14. On October 26, 2006, Sergeant Webster questioned Mr. Dubois again. Mr. Dubois felt much better. He was properly *Mirandized*, acknowledged each warning and

waived his rights. He was coherent, alert and unlike the previous interview, easy to understand. As in the past, he never asked for a lawyer or said he did not want to talk. Instead he appeared eager to talk.

15. On November 1, 2007, Sergeant Webster questioned Mr. Dubois again. He was no longer in the special care unit. He and Sergeant Webster established a good rapport. Mr. Dubois seemed to enjoy talking. He wanted his side of the story told and repeated it often. Mr. Dubois told Detective Webster repeatedly that he did not know Detectives Connors and Doherty were cops. He thought they would have shown him a warrant if they were cops.

16. On November 9 at the Cumberland County Jail, Sergeant Webster questioned Mr. Dubois again at Mr. Dubois' request. Mr. Dubois had been indicted and he was unhappy with some things he had heard on TV. He wanted to talk.

17. In all of the last three interrogations mentioned above, Mr. Dubois was properly *Mirandized* and responded appropriately. He understood all of his rights. He waived his rights and answered questions freely. He never asked for a lawyer or revoked his right to remain silent. He was persistent in pressing his position that he did not know the detectives were law enforcement officers.

18. On October 13 and October 24, 2006, Mr. Dubois was not well enough to exercise his own free will and rational intellect to make a voluntary statement.

19. On October 28, 2006 Deputy Sheriff Marc Marion was working at the Cumberland County Jail guarding Secured Unit 1050, where Mr. Dubois had a hospital bed. Mr. Dubois motioned Deputy Marion to enter his room. He asked for water. Deputy Marion did not get water because that was not his job. Instead Deputy Marion told Mr. Dubois that he did not look well. Mr. Dubois responded that the police had shot him. He added that if the cops had come the next day he would have used an UZI.

Deputy Marion then asked Mr. Dubois a series of questions about the UZI and other weapons. Deputy Marion did not *Miranda* Mr. Dubois.

20. Mr. Dubois was not a resident at the Elm Street apartment where the shooting took place. Neither was Sarah, who was a friend of Mr. Dubois. Mr. Dubois moved around from place to place and was planning to go to Virginia just before the shooting took place.

21. Mr. Dubois first denied that he said on a phone call to the station that he was heading for Virginia. When confronted with documentation that he had in fact made that statement, he said he must have been under the influence of drugs at the time. Mr. Dubois produced no evidence that he lived in the Elm Street apartment other than his own word. The lease holders did not testify. Sarah did not testify. No one corroborated his assertion of residence. Mr. Dubois paid no rent for the apartment. Finally, Mr. Dubois was an admitted drug dealer. Mr. Dubois was not a credible witness.


## DISCUSSION

Mr. Dubois does not have standing to object to the search. The evidence points to Mr. Dubois visiting the Elm Street apartment to be with Sarah and perhaps to arrange some quick drug deals. That does not give him standing.

Even if Mr. Dubois had standing, the police conducted a lawful search and seizure. It is settled law that an outstanding felony warrant gives police the authority to enter a home without permission to execute the warrant. The police in this instance had evidence that a person fitting Mr. Dubois' description was in the apartment. They knocked on the door, announced themselves, identified themselves as officers and stated their purpose to Sarah, the person who opened the door. Detective Connors saw

4

Mr. Dubois from the doorway. At that time the police were justified in taking whatever steps were reasonably necessary to arrest Mr. Dubois. They took those steps.

Even if the intrusion into the Elm Street apartment was unlawful, which it wasn't, there is no evidence to suppress. An unlawful entry by the police does not give the occupant of the apartment the right to shoot the police. The shooting instigated a new criminal episode and the police were authorized to seize any evidence connected to the shooting, lawful entry or not.

The State has conceded that the first interrogation of Mr. Dubois on October 13, 2006 was involuntary, not because of any impropriety on the part of Detective Webster and his associate, but because Mr. Dubois was not physically or mentally capable of making an intelligent, knowing waiver of his rights.

After listening to the evidence and to the interrogation itself, I am not satisfied beyond a reasonable doubt that Mr. Dubois was capable of freely exercising his will and rational intellect to make a voluntary statement on October 24, 2006. Although Detective Webster testified that Mr. Dubois was coherent and responded to the questions asked, he also testified that Mr. Dubois was still weak. Mr. Dubois still had a tube down his throat and was having trouble with phlegm. Many of his answers were inaudible.

On October 26, 2006 Mr. Dubois' condition had improved considerably. He had no medical problems during the interrogation. He was cheerful. His voice was clear. Mr. Dubois was alert, responsive, and cooperative. From October 26, 2006 on, I am satisfied beyond a reasonable doubt that Mr. Dubois understood his *Miranda* rights, waived them and made an intelligent, informed decision of his own free will to talk with the detectives.

On October 28, 2006, at the jail, Deputy Marion responded to a request from Mr. Dubois for water by telling Mr. Dubois that he didn't look very good. Mr. Dubois responded by reminding Deputy Marion that the police had shot him. Mr. Dubois then added his oft-spoken mantra that he didn't know they were officers. Mr. Dubois then volunteered words to the effect that if the police had come the next day, he would have had an UZI. Deputy Marion then asked Mr. Dubois a series of questions about guns and gun sources. Mr. Dubois responded to Deputy Marion with what could be construed to be incriminating answers.

I am satisfied that Deputy Marion's statement that Mr. Dubois did not look well is not the type of question or remark designed to elicit an incriminating response. Therefore, I am satisfied that Mr. Dubois' statement about the UZI was a voluntary statement and is not suppressible. On the other hand, Deputy Marion's questions after that voluntary statement were a form of custodial interrogation about an issue in the case. Saying that Deputy Marion was pursuing information on other firearm issues is not a persuasive argument. This case is about the use of firearms. The police cannot interrogate Mr. Dubois about firearms without reading him his *Miranda* rights. Two days had passed since Mr. Dubois had last been interrogated. Mr. Dubois had last been interrogated not by Deputy Marion but by Detective Webster. A new *Miranda* warning was necessary and it was not given.

Based on the above, the clerk will make the following entry on the docket by reference:

1. Mr. Dubois' motion to suppress insofar as it relates to the alleged unlawful entry into the Elm Street apartment in South Portland is denied in all respects.

2. Mr. Dubois' motion to suppress insofar as it relates to the interrogations on October 13 and October 24, 2006 is granted.

6

3. Mr. Dubois' motion to suppress insofar as it relates to the interrogations on October 26, November 1, and November 9, 2006 is denied.

4. Mr. Dubois' motion to suppress insofar as it relates to the October 28, 2006 exchange between Deputy Marion and Mr. Dubois is granted in part and denied in part. The exchange up to and including Mr. Dubois' first reference to the Uzi is admissible if the trial judge deems it relevant. All questions and answers following the voluntary statement (the questions relating to the Uzi, other weapons and sources) are suppressed.

DATED:     October 15, 2007

_W. S. Brodrick_____
William S. Brodrick
Active-Retired Justice, Superior Court